Thank you. Our next argument in the morning is in two consolidated appeals, 24-1048 and 24-1082. Erika Mabes v. Shannon Thompson. Mr. Rubel, we'll start with you, correct? Okay, good morning. Whenever you're ready. May it please the Court, both the District Court and the Mabes treat legal issues as factual questions. Issues regarding the existence of an emergency, the existence of probable cause, and the sufficiency of the investigation must be addressed as legal questions under the Qualified Immunity Standard. The legal question is whether every reasonable official would understand that a constitutional right is being violated. Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. In this case, what the District Court should have done was looking how each individual DCS official reacted after a two-month-old infant was found sleeping face down and nonresponsive. The parents waited 15 minutes to seek help. An EMT described color returning to the child's body after oxygen was administered. Anoxic brain injury, skull fracture, and abdominal bruising were found at the hospital. And DCS was told by multiple medical experts that the injuries were consistent with abuse. Drugs were found in the house, and the father refused a drug test. Reasonable child welfare workers could rely on those undisputed facts to remove the children from the house, seek court intervention, and substantiate the allegations of abuse and neglect, even accepting all of the factual assertions by the Mabes, which, of course, we must do. The DCS defendants here should have been entitled to qualified immunity. There are basically three deprivations they're alleging here, and I'm happy to address both of those in the limited time, all three of them. Can I ask you about the qualified immunity, though? Here's what I've struggled with. When I look at the District Court opinion, we know from our precedent, we know from the Supreme Court, qualified immunity has to be assessed defendant by defendant, claim by claim, correct? Correct, which was not done here. Right, and it's very hard to, as a court of review, which we are, it's very hard to review that which was not done that way. And so I observe that to ask you, what are you asking us to do? Well, I think the important facts here are actually pretty limited, even though we have a very large record, lots of discovery. But this court can look at those three claimed deprivations, the removal, the claimed misrepresentations, the preliminary inquiry, and the due process that happened later, and see that what was done here by the DCS workers met the minimal, at least, constitutional requirements. So to answer your question, I think this court does not need to remand. This court can find, without spending that much time in this record, that it's not clear. To undertake the defendant by defendant, claim by claim analysis in the first instance on appeal? And we do cite case law in our brief where that has been done in the past where it hasn't happened yet. And these aren't that complicated of issues where I think it could easily be done here, where this court can find that, do that analysis. What's complicated is the multiple defendant part of it. There's, I think there's seven or eight different defendants. They didn't play the exact same role. Correct. And they shouldn't be liable for the actions of the other ones. And we can look at each of the three deprivations, and two of the defendants they don't allege really had anything to do with anything. The rest of them, their roles, I think our briefing will make it pretty easy for you to do that. That's breaking out an analysis and see that we have all these reasons why there was exigency, why there was probable cause, which would allow the removal. The Chin's representation, that's basically just looking at the preliminary inquiry, basically the probable cause affidavit, and seeing whether or not their couple claimed actual factual misrepresentations changed the analysis. So I think that's pretty straightforward. And the due process deprivation, at the end of the day, it's basically the, you can look at whether or not they looked at exculpatory evidence, and they clearly did here. I see my time is up. Thank you very much. We would ask that this court overturn the finding of summary judgment. Okay. Thank you, Mr. Rubel. Scoot Wine, good morning. Good morning, Your Honors. May it please the court. The district court erred when it denied Dr. Thompson's summary judgment on her request for qualified immunity. Picking up on Your Honor's question about what we're asking this court to do, it is to reverse the district court and award Dr. Thompson's summary judgment on her defense of qualified immunity. The issue before you for Dr. Thompson is very straightforward. Neither the maids nor the district court have identified any law that would clearly establish that every reasonable pediatrician in Dr. Thompson's shoes would have known that by declining to further credit or consider information the maids were providing her in diagnosing their two-month-old child as a victim of non-accidental trauma, she was personally participating in a constitutional violation. The argument that the maids make for the first time on appeal, that they don't have to make this showing as to Dr. Thompson, not only is wrong, it concedes the point. And the clear notice requirement of qualified immunity is the purpose of that requirement is exemplified by the facts of this case. Child abuse pediatricians like Dr. Thompson must act quickly to wade through a variety of information that is presented to them to assess the likelihood that a child is a victim of maltreatment and to figure out a plan to further treat that child. Qualified immunity's clear notice requirement ensures that pediatricians like Dr. Thompson will take steps in those moments to think only of the pediatric patients that they are serving and not of their own potential personal liability if it later turns out that they were mistaken or some other medical expert after the fact would disagree with them. Not only have the maids failed to identify any closely analogous case that would have put Dr. Thompson on notice that her conduct was going to be deemed unconstitutional, but construing all of the facts in the maids' favor, the maids also have not shown that Dr. Thompson in fact violated their constitutional rights. Circling back, what we are asking this court to do is reverse the district court's denial of Dr. Thompson's request for summary judgment on qualified immunity and award her qualified immunity. I will reserve the remainder of my time for rebuttal. Okay, very well. Mr. Catlin, good morning. May it please the court. My name is Brad Catlin and I represent the Appellees, the maids' family in this case. This is a case about what happens to a family when child abuse investigators ignore this court's clear authority about what they're supposed to do during child abuse investigations. And this court should dismiss this case because there are genuine issues of material fact that affect whether each of the defense is entitled to qualified immunity. In the time I have today, I'd like to discuss two separate issues. The first one is a child abuse investigator's obligation not to ignore exculpatory evidence when investigating child abuse. And the second one is how Dr. Thompson's role shows that she is liable and not subject to qualified immunity. Before you do that, can I just pause you and I'm sorry for interrupting you. We're here on a denial of summary judgment sending a case to trial is ordinarily not appealable. And that's not what the appeal is, correct? The appeal is from the denial of qualified immunity. Correct, Your Honor. Okay. And so when you started where you started by saying, you didn't say it this way, I'll just shorthand it. You know, the case is properly going to trial. That's basically what you're saying because there are genuine issues of fact. Right, okay. Think, all right, that might be if you just go with a Rule 56 summary judgment analysis and apply all the summary judgment standards. But the more that you could focus your comments on the qualified immunity aspect of it because that's the only basis for appellate jurisdiction, right? In other words, there isn't an appeal of the Rule 56 ruling. There can't be. You're right, Your Honor. But this court doesn't have appellate jurisdiction if there are questions of material fact that affect. Travel down that road. And that's what I intended to do and I apologize. Well, I probably interrupted you, so maybe it's on me. So the first thing that I'd like to focus on, which is that obligation this court has already found in DePue and Boyd for child abuse investigators to consider both inculpatory and exculpatory facts and to develop alternate explanations and particularly not ignore exculpatory evidence. And that obligation, even though we have a lot of different kinds of violations, affects almost every violation in this case. For example, at the time of the initial removal, the evidence that the DCS investigators had, none of it showed that Dr. Mabes herself, who was the mother of the children, posed any danger to the children at all. When asked during their deposition, what evidence did you have that Dr. Mabes ever abused or injured any of her children, the answer was none other than the fact that she was the mother. And I think that's important in this case, even if you ignore everything else, because in this court's prior decision in Sullivan, you had a situation where a child was obviously a child of a mother and a father. And it was removed from a father because there were concerns that the child had an injury that was the subject caused by abuse. There have been prior allegations of abuse by the father, and they only removed from the father, not the mother. And one thing that this court said was that this court found that to be particularly important because the removal was no greater than was necessary to address the danger. And in this case, at the time of the removal, the DCS workers, when they ordered the removal of the children from their parents, they ordered a much greater removal than was possible. Therefore, Dr. Mabes couldn't have any role in the treatment of her critically ill child as a result of the removal. If we go on to things like when they filed the Chins petition and the things in there, it's still again the same basic kind of concept, ignoring the exculpatory evidence. Ignoring the evidence that Brian Mabes denied that he ever admitted to using illegal drugs with the children. Ignoring the fact that under Indiana law, the fact that there are drugs in the home where the parent uses drugs is not a sufficient basis to find a child is abused or neglected. To ignore the fact that they knew about the events that happened at Hendricks Regional Hospital. So here's the difficulty. I'm going to go right back to where I started. The difficulty is the they before us are either seven or eight different people, right? The focus of the briefing, to my eye, is very much on Dr. Thompson. I think, okay, well, let's focus on Dr. Thompson for a minute. But you've got all these other people. So I'm being perfectly transparent with you. What's running through my mind are why not qualified immunity for Lyman? Why not qualified immunity for McFeely, for Crow, et cetera? And what you're doing is you're talking about the overarching narrative of the case. And I apologize, Your Honor. Part of it is I only have ten minutes. And I was trying to be but I can address that more specifically. So for each individual defendant, other than Thompson, who I'll get to in just a minute, you have Davis and Oaks who are the initial people who did the investigation. Oaks is the one who said the false things about what Brian said. We think that's a violation right there. Davis is the one who signed and filled out the Chins petition. The information she had in the Chins petition affected the rest of the investigation. We think that she's liable from there. Nobody but those two and their supervisor, Lyman, are responsible for the removal and the Chins petition. It's only those three that had involvement there. If you're talking about the CCWAR, the administrative review, Crow is liability for that because she's the one who screwed that up. If you're talking about the reassessment and the investigation afterwards, that's McFeely, that's Crow, and that's Lyman. During none of those, as we can see from the summary judgment. Did the district court do any of what you're doing in the courtroom? The district court did not do that in their opinion. But we did that in our briefing below. We did that in our briefing to you. And we described the different stages at which we think there's liability for each defendant along the way. And we don't think that's an especially difficult job for you. I understand your concern about whether you should—my understanding of your concern is should we remand back so we can have the district court do that claim-by-claim, defendant-by-defendant analysis. I'm not aware of any rule that says they are absolutely required to. And I take no position on whether this court's going to require that and remand so the court can do that or not. As an advocate, I just want to make sure that the right result is reached. I'm not as concerned about the method that we get there. And the right result is to let this case go to a jury. Do you want to say a few words about Dr. Thompson? Sure. Dr. Thompson, I think an important thing for this court to understand about Dr. Thompson, she's a state employee who's operating according to a state program because she worked for the Indiana School of Medicine, which is a state school. The state program was the PEDS program, which is run under her direction for the Indiana University School of Medicine pursuant to an agreement with DCS in which she and her colleagues review 6,000 cases a year to forensically help DCS determine whether children are medically subjected to abuse or neglect. She was clearly acting in that role forensically as an investigator on behalf of DCS. During the course of this case, she didn't offer any treatment. She was just trying to conclude what is the cause of the injury. She wasn't treating conditions. And I think that's an important thing to do because when you look at the cases that this court has decided, like DePue and Boyd, it doesn't talk about social workers. It doesn't talk about DCS or child welfare investigators. It talks about investigators. And Dr. Thompson was an investigator investigating where the child abuse took place. Anybody who has an open mind to looking at this court's precedent would have seen that anybody investigating child abuse needs to not ignore that other evidence. And she did. And there's a couple of reasons, explanations I can do about that. For example, she talked about the brain injury that occurred and how it was something that was caused by accidental head trauma. But she backed away on that later and said, no, it wasn't. In fact, this child was without oxygen for 12 minutes at the hospital. He turned blue and cyanotic. He had basically no blood flow. He took 44 minutes for him to recover. When the ENTs got to the home, and Dr. Thompson said, well, maybe this happened at the home, when they put blow-by-oxygen on him, he was at 100% in two minutes. I think there's room for a jury to find that there's willful disregard of the facts by Dr. Thompson when she's ignoring what happened at HRH. And the same thing when it happens with the bruise, which they put in there and she's relying on to say that there was abuse. This bruise wasn't ever seen anywhere in any medical facility by any medical person prior to being at Riley. Dr. Thompson was told about the CPR that was performed there. It doesn't show up in her notes, but Dr. Maves says she told Dr. Thompson about it, Same thing with she told DCS that the brain injury was related to an old skull fracture. But her colleagues at Riley at the time said they didn't see how there was any way that this was related. So the things she told DCS were either recklessly or willfully disregarding the facts that were available to her, jumping to conclusions. And with that, I just ask this court to dismiss this case and send it back to the trial court. Okay, Mr. Catlin, thank you very much. Thank you, Your Honors. I'm going to run through a couple of points. On jurisdiction, the Maves have made arguments about this court not having jurisdiction, but they've actually identified, especially as to Dr. Thompson, no disputed facts for purposes of qualified immunity. We've been over backwards in our briefing to accept all the facts in the Maves' favor. The court has jurisdiction to hear this appeal. On the question of remand, we cited in our briefing why this court need not remand, and we would strongly encourage the court to not do so and to address, at minimum, Dr. Thompson's qualified immunity argument. The court has explained, you know, that when it's inefficient or unnecessary to remand, it need not do so, and it can decide the merits of the appeal here. All the facts before the court are the same as they were before the district court. The court reviews a decision about qualified immunity de novo. And also, the policy aims of qualified immunity are that it should be decided as early on in litigation as possible to reprieve officials of having to sustain further litigation if they're entitled to qualified immunity. So we would request this court to actually decide the issues and not remand. On the Maves' argument that DePue and Boyd set a standard for Dr. Thompson, I want to be really clear that the Maves abandoned this argument on appeal. They did not make it in their briefing. We raised it in our opening brief, and the Maves did not respond to it. If you look at DePue and Boyd, those cases do not talk about medical professionals at all. They talk about child caseworkers at the Department of Child Services or in Illinois, excuse me, I think it's Department of Child and Family Services, but same thing. Those cases have no bearing on Dr. Thompson. She is a medical professional. She did not have any kind of control over the scope of DCS's investigation. She was there for medical guidance and opinions. We accept that for purposes of this appeal that she was a state actor, a state employee, that's fine, but she's not a caseworker. She is a medical pediatrician who is diagnosing suspected child abuse. She doesn't review inculpatory and exculpatory evidence. She takes no steps to identify who a perpetrator might have been. Those cases simply have no application to Dr. Thompson, and certainly she wouldn't have been on clear notice at the time of these events that those cases extended to her. Qualified immunity has two parts. One is that the constitutional violation had to have been clearly established. The other is that there was a constitutional violation. As to Dr. Thompson, you don't even need to reach the question of whether there was a constitutional violation because there was no clearly established law identifying for Dr. Thompson or other reasonable child abuse pediatricians that by not considering or crediting certain information that the maids were providing her, she was committing a constitutional violation. There's simply no standard out there, and on appeal, the maids have not pointed you to one. The other thing I just want to address as to sort of the facts at the time, again, I don't think you even need to reach that for Dr. Thompson, but just to be clear, this is a 2-month-old immobile infant that had an unexplained skull fracture at the time that he arrived at Riley Hospital for Children in Indianapolis that Dr. Thompson and the DCS professionals first started assessing him. So it is true that there were explanations for certain aspects of his anoxic brain injury, for example, or other things, the bruise, but he had an unexplained skull fracture. That is undisputed. So it is an immobile infant with a skull fracture that the parents do not have a way of explaining, and the evidence is also undisputed that the immobile infant was in the home under the care of the parents. Suspicion was reasonable, whether you say it's reasonable cause or probable cause. There is just no disputed facts or, excuse me, undisputed facts in the MABE's favor in the record on this appeal that Dr. Thompson did anything that was reckless, that she had serious doubts about the information that she was communicating, certainly that she did anything willful. So if you were to reach the constitutional violation, there's no evidence of that, but you don't need to. With that, we ask the court to reverse the district court and award Dr. Thompson qualified immunity. Thank you. Mr. Gutwein, thanks to you. Mr. Robel, thanks to you. Mr. Catlin, thanks to you and your colleague. We'll take the two appeals under advisement.